STATE OF MISSOURI, on the Information of ROY McKITTRICK, Attorney General, ex rel. CITY OF TRENTON, Relator, v. MISSOURI PUBLIC SERVICE CORPORATION.—No. 36189.—174 S. W. (2d) 871.

Court en Banc, July 20, 1943.

Rehearing Denied, November 1, 1943.

*Roy McKittrick*, Attorney General, *Covell R. Hewitt*, Assistant Attorney General, *Gerald Cross, Pross T. Cross,* and *Russell N. Pickett,* for relator; *Harry J. Fair* and *R. Leroy Miller* of counsel.

*T. J. Layson, D. C. Chastain* and *A. Z. Patterson* for respondent; *Patterson, Chastain & Smith* of counsel.

LEEDY, J.—This is an original proceeding in the nature of quo warranto brought by the Attorney General, at the relation of the City of Trenton, to oust respondent, and to exclude it "from all rights, privileges and franchises of furnishing electric light and power within the city," and "from all rights, privileges and franchises

of occupying the streets, avenues and alleys of said city . . . with its poles, wires and other electrical equipment.''

The information alleges, in substance, that respondent is engaged in operating an electric light and generating plant in the City of Trenton, but that it has no right, franchise or privilege granted by the city which authorized its operation, or which authorized it to occupy the streets, avenues, etc., thereof with its poles and equipment; that on April 6, 1938, by ordinance No. 1475, the city notified and directed respondent to discontinue all electric light and power service in said city, and to remove its poles and equipment within fifteen days; and that respondent failed to comply with said ordinance; that the city has in operation an adequate municipal light and power plant and distribution system, for the construction of which $250,000.00 of the city's general obligation bonds were issued, and that there exists no public necessity for continuance of the electric service supplied by respondent; that the aforesaid direct obligation bonds, with interest thereon, constitute a tax lien upon all the taxable property within the city which must be paid by direct tax unless the same can be paid from the earnings of the municipal plant; that the competition of respondent might result in such a direct tax being levied. The prayer is that respondent be ousted from the city, and be ''excluded from all rights, privileges and franchises of furnishing electric light and power within the city,'' and ''from all rights, privileges and franchises of occupying the streets,'' etc., and that it be required to remove its poles, wires and other electrical equipment.

Respondent filed answer with which was coupled a plea in abatement, wherein it [873] alleged it owns an electric generating plant and distribution system in said city, and is using the streets, alleys, etc., in connection therewith; denied it had no franchise of operating rights in said city, and alleged that it is the owner and successor in title to a franchise granted by the City of Trenton to C. D. Jones and associates on July 22, 1886; that said franchise was without definite term, and was for a perpetual term, but was not exclusive, and that the same is still in full force and effect, and that respondent is operating pursuant thereto. Without waiving its claim of a valid franchise, the answer sets up a plea of estoppel, and that the city has been guilty of such laches in the institution of the action as to prevent its securing the relief prayed. Respondent admitted the enactment of Ordinance No. 1475, and that it had refused to discontinue its electrical business in said city, and to remove its poles and other equipment from the streets, and denied that the municipal plant and distribution system was sufficient to furnish all users of light and power within the city with efficient and continuous service.

The reply set up a plea of res judicata based on a former judgment between the parties whereby the Jones franchise was adjudged invalid by the United States District Court for the Western District of Missouri.

A Special Commissioner was appointed to take the evidence, and report the same to this court together with his findings of fact and conclusions of law. His report, with which was returned a thousand-page transcript of testimony, recommended ouster as prayed, and respondent filed exceptions thereto.

From 1872 until March 1, 1893, the "Town of Trenton" operated under a special charter granted by the Legislature. [Laws, 1872, pp. 478-488.] On the latter date it became a city of the third class, having elected so to do, and surrendered its special charter.

On July 22, 1886, while operating under said special charter, the town council enacted an ordinance which granted a non-exclusive gas and electric franchise to "C. D. Jones and associates, their successors and assigns, hereinafter to be known as Trenton Gas & Electric Light Company."[1][874] A gas works was constructed under said

---

[1]"An Ordinance Authorizing the Construction of Gas and Electric Light Works, and Establishing Rules and Regulations Governing Same. ·

"Be it ordained by the Council of the Town of Trenton as follows:

"Section 1. That said Town of Trenton hereby grants unto C. D. Jones and associates, their successors and assigns, hereinafter to be known as the Trenton Gas & Electric Light Company, the privilege of erecting gas and electric light works or either of them in said Town of Trenton, State of Missouri, and of repairing and extending the same and of laying gas mains and pipes (underground) and erecting lamp posts, electric light poles and wires for the purpose of supplying the town and citizens with gas and electricity for light and other uses. But nothing herein shall be construed as giving said gas and electric light company any exclusive rights as to any of the privileges hereby granted.

"Section II. For the purpose of carrying into effect the privileges granted by Section One of this Ordinance, said gas and electric light company is hereby authorized to use the streets, alleys, sidewalks, bridges and public grounds of said town of Trenton and to make all necessary excavations therein, but the same shall be done with due and reasonable dispatch and with the least practicable interference with or (without) inconvenience to the rights of the public and individuals; and said Company shall restore all streets, alleys and sidewalks, bridges and public grounds when excavated by them to their original condition. So far as practical and in case any obstruction caused by said company shall remain longer than three days after notice to remove the same or in case of neglect by said company to protect any dangerous places by proper guards, said Town of Trenton may remove or protect the same at the expense of said Company.

"Section III. In laying down pipes and mains and erecting lamp posts, poles or wires, said gas and electric light company shall conform to all reasonable regulations which are or may be prescribed by the Town Council and shall not interfere with to change or injure any water pipes, drains or sewers of said town or any water company grantee of said town and shall be subject to the directions of the Committee on Internal Improvements.

"Section IV. Said Trenton Gas & Electric Light Company is hereby authorized to construct and maintain gas and electric light works or either of them in said Town of Trenton, and to repair and enlarge the same and to carry on the business of manufacturing gas and electricity or either of them and distributing the same to the Town of Trenton and citizens thereof, and in consideration of the advantages to be derived by the town and its citizens by the constructions and maintenance of gas works in said town it is hereby understood and agreed that said Town of Trenton will subscribe for and use during the full term of fifteen years gas street lamps to the number of at least ten, to be located by the Mayor and Council along the

franchise, and, as required by the terms thereof, it was completed before December 1, 1886, since which time gas service, by respondent and its predecessors, has been continuous, under said franchise. But the holders of said franchise did not construct an electric plant or operate an electric plant for a period of eleven years thereafter, or until 1897, when they acquired the electric franchise which had

lines of street mains laid down. Provided that said town may order any lamp posts moved to any other point on the line of mains already laid down by paying the cost of such removal and that whenever required to supply street lamps beyond the line of street mains already laid down, said company shall extend the mains to any other point for the purpose at the expense of the town.

"Section V. Said company shall erect posts and lamps (the lamps to be of metal and glass and posts of iron of good pattern) all connected, pipes and fitted ready for use at a cost to the town of not exceeding Twenty Dollars per lamp, and supply the same with gas during all dark hours of the night not lighted by the moon, as per customary schedule, at not exceeding Two and 50/100 Dollars per month per lamp nor the average price paid for similar services in cities and towns of about the same population in the State. The average flame of each lamp to equal to that of sixteen standard candle power and in all respects of a good and satisfactory quality. The customary schedule of lighting being to light one half hour after sunset and one hour before moon set and to extinguish one hour before sunrise and one hour after moonrise. It is also agreed that any additional lamps ordered along old or new mains shall come within the terms and conditions of this ordinance the same as if enclosed in the original number. Said Company shall be allowed the sum of Twenty-five Cents per month for lighting, extinguishing, cleaning and ordinary repairing of said lamps, until the number of lamps shall reach thirty, when said Company shall assume the care of said lamps.

"Section VI. This Ordinance is conditioned on the building or causing to be built by the said Trenton Gas & Electric Light Co., gas or electric light works in the said Town of Trenton of sufficient capacity to supply the same and its citizens and laying not less than one mile of street mains on Water & Elm Sts., and branching therefrom, which said gas or electric light works shall be commenced on or before August 1, 1886, and completed on or before December 1, 1886, and also upon supplying said town and its citizens with gas of a quality equal to that of sixteen candle power as per customary standard at a price or rate not exceeding the equivalent of Two and 50/100 Dollars for one thousand ft. of sixteen standard candle power coal gas, provided that whenever the number of private consumers shall reach two hundred, such price or rate shall be reduced to Two dollars for the equivalent of one thousand ft. of standard coal gas, and that the cost to private consumers shall at no time exceed the average price paid in cities or towns of the same size in this state for the same amount of light.

"Section VII. That in case of a failure at any time to supply the said town with a good quality of gas for the space of ten days except in case of injury to the works in which case all possible diligence shall be exercised to repair the same or should said company for any reason abandon the enterprise or cease to operate the works, then the rights and privileges herein granted shall cease, and determine and no notice shall be necessary on the part of the Town, but so long as said Company shall well and truly keep and perform the conditions of this ordinance, the rights and privileges granted herein shall not be revoked or forfeited for any other cause and said Company shall at all times have equal rights as to the use of the streets, alleys, sidewalks, bridges and public grounds now or hereafter belonging to said Town with any other company which may hereafter be chartered.

"Section VIII. That whenever said town or any citizen thereof shall desire to use gas in any street or locality not reached by the mains already

been granted to W. E. Bailey April 2, 1890. The Bailey franchise was for a term of ten years. By amendment (March 14, 1891) its duration was extended to twenty years, so as to expire April 2, 1910. Bailey built an electric **[875]** plant thereunder in 1890. It was operated by the Trenton-Thompson-Houston Electric Company until February 8, 1897, on which date said electric plant and the Bailey franchise were acquired by the holders of the Jones franchise, so that the gas and electric properties in Trenton were thereupon consolidated in one ownership under the name of Trenton Gas & Electric Company, of which respondent is admittedly the successor. From the date of the aforesaid consolidation until April 2, 1910 (the time fixed by the ordinance of March 18, 1891, for the expiration of the Bailey franchise) the several conveyances of the property specifically referred to both the Jones and Bailey franchises. Thereafter only the Jones franchise was mentioned in the conveyances. It may be said that there had been only one electric light plant in Trenton until the municipal plant was built about 1936. Other facts, if pertinent, will be stated in the course of this opinion in connection with the points to which they relate.

The issue of res judicata: In December, 1936, respondent's predecessor instituted a suit in the District Court of the United States of the Western District of Missouri to enjoin the City of Trenton from constructing and operating a municipal light plant for failure of the municipality to comply with certain statutes with respect to the letting of contracts for the construction thereof. Plaintiff in said suit alleged that it was entitled to maintain the same as a taxpayer, and also as the owner of the Jones franchise, the validity of which it as-

laid said company shall upon application of one or more consumers to each one hundred ft. of main extension required proceed to lay such additional mains as may be necessary to supply such petitioner within a reasonable time for the making of such application and agreement to use gas to the company; for this purpose each additional street lamp shall count as one consumer and provided said company shall extend the mains any greater distance when so required upon the applicant's paying the cost of such main extension beyond the 100 ft. above provided for.

"Section IX. The privileges herein granted are upon the express conditions that said company and its assigns shall be liable for all damages or injury to persons or property caused by the neglect or mismanagement of itself or any of its employees while engaged in constructing or operating its works and should the town be sued therefor, said company shall be notified of such suit and thereupon it shall be their duty to defend or settle the same and should judgment go against the town in any such case, the town shall recover the same with costs from said company, and the record of judgment against the town in any such case, the town shall recover the same with costs from said company, and the record of judgment against the town in any such case shall be conclusive evidence to entitle the town to so recover against said gas and electric light company.

"Section X. All acts, ordinances and parts of acts heretofore passed inconsistent with this ordinance are hereby repealed.

"Section XI. This Ordinance shall take effect and be in force from and after its passage.

"Passed and approved this 22nd day of July, A. D. 1886."

serted. This was denied by defendants. In granting a temporary injunction the court concluded that the contracts for the construction of the municipal plant were unlawfully entered into in that the procedure prescribed by certain Missouri statutes was not followed. [19 F. Supp. 38, l. c. 44.] On final hearing it was held, among other things, that the Jones franchise was invalid because it had not been submitted to the voters of the town as required by Secs. 951 and 952, R. S. '79, and that plaintiff, in its status as a taxpayer, was not entitled to the relief sought because the evidence failed to show it would save anything in taxes. The court added that the defense of laches had been sufficiently sustained. Upon the findings of fact made, it was declared as a conclusion of law "that the plaintiff has no such property interest as entitles it to the relief in equity prayed by it in this proceeding." The temporary injunction theretofore granted was ordered dissolved, and plaintiff's bill dismissed. [19 F. Supp. 45.]

The case reached the United States Circuit Court of Appeals, 8th Circuit, on appeal. As appears from the opinion of that court [95 Fed. 1], it disagreed with the trial court's conclusion with respect to the right of the utility to maintain the suit, saying in that regard, "We are of the opinion that the appellant, whether it had the franchise which it claims or not, had an interest sufficient to enable it to maintain this suit in so far as it sought to enjoin the threatened competition which it claimed would be unlawful." It held, however, that [876] the "unlawfulness [of the contract] complained of [and found by the trial court] amounts to little more than an irregularity in advertising for bids, which, so far as appears from the record, prejudiced no one. It was an irregularity which could readily have been corrected, if attention had been promptly called to it. A decree which would leave the city with a completed plant on its hands which it could never operate, merely because it had published its notices in the wrong newspapers and had failed to include in its notices the matter required by Sec. 13320a, could not be justified." It further held that the utility had been guilty of laches. The concluding paragraph of the opinion reads as follows: "We think that the decree appealed from was right *for the reasons stated,* and it is therefore affirmed." (Italics ours.)

Some emphasis is placed on the position taken by the utility in the appellate court wherein it sought to modify the decree because, as stated in its motion therefor, "that under the opinion there is room for a contention by the respondent [city] in subsequent actions that by the affirmance of the decree of the district court the decision of the district court that the appellant's franchise is invalid would be res judicata between the parties." A similar, and even stronger, statement is contained in the utility's suggestions in opposition to the city's motion to dismiss. We regard these matters as having no

real significance in determining the question of law involved, and so they will not be further noticed.

Relator relies on Southern Pacific Railroad v. U. S., 168 U. S. 1, 18 S. Ct. 27, 42 L. Ed. 355, and particularly the portion cited with approval in Case v. Sipes, 280 Mo. 110, 217 S. W. 306 (opinion by RAILEY, C.), as follows: " 'The general principle announced in numerous cases is that a right, question, or fact distinctly put in issue and directly determined by a court of competent jurisdiction, as a ground of recovery, cannot be disputed in a subsequent suit between the same parties or their privies; and, even if the second suit is for a different cause of action, the right, question, or fact once so determined must, as between the same parties or their privies, be taken as conclusively established, *so long as the judgment in the first suit remains unmodified.* This general rule is demanded by the very object for which civil courts have been established, which is to secure the peace and repose of society by the settlement of matters capable of judicial determination. Its enforcement is essential to the maintenance of social order; for the aid of judicial tribunals would not be invoked for the vindication of rights of person and property if, as between parties and their privies, conclusiveness did not attend the judgments of such tribunals in respect of all matters properly put in issue and actually determined by them.' " (Italics, the present writer's.) A sufficient answer is that the decree of the district court did not remain unmodified. It was supplanted by the decree of the appellate court, which decree, as we have seen, did not determine the question of the validity of the Jones franchise.

But relator cites Russell v. Russell, 134 F. 840, and stresses the holding, as indicated by the following syllibi, "A question expressly determined by a court of equity, whose decree is affirmed on appeal, is res judicata between the parties, although such question was not considered by the appellate court, whose affirmance was based on other grounds." Even if the holding is as broad as relator contends (which is subject to question), the doctrine of that case is not one of universal application. Indeed it has been repudiated by the Circuit Court of Appeals, 2d Circuit, in Moran T. & T. Co. v. Navigazione Libera Triestina, S. A.: "The appellee, however, cites Russell v. Russell, 134 F. 840 (C. C. A. 3), and Oglesby v. Attrill, 20 F. 570 (WALLACE, J., in U. S. Circuit Court), as holding that an unconditional affirmance of a judgment by an appellate court, though rendered on entirely different grounds or only on some of the grounds upon which the decision of the lower court was rendered, leaves the questions determined by the lower court as res judicata in all respects. To treat as controlling the findings of a trial court when the appellate court upsets or disregards them and renders a decision of affirmance on different grounds furnishes parties to other litigations affected by the decision a false guide. There seems to be a paucity of authority on this

question, and with'all due respect we cannot subscribe to such a formal treatment of the situation." [92 F. (2d) 37.]

We think that under the decisions of the Supreme Court of the United States, as well as the Missouri cases applying the doctrine of estoppel by judgment, the Special Commissioner was correct in holding [877] that the former judgment relied on did not operate as a binding adjudication of the invalidity of the Jones franchise. The principles of the doctrine are as stated in Cromwell v. County of Sac, 94 U. S. 351, 24 L. Ed. 195, as follows: "In considering the operation of this judgment, it should be borne in mind, as stated by counsel, that there is a difference between the effect of a judgment as a bar or estoppel against the prosecution of a second action upon the same claim or demand, and its effect as an estoppel in another action between the same parties upon a different claim or cause of action. In the former case, the judgment, if rendered upon the merits, constitutes an absolute bar to a subsequent action. It is a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.

"But where the second action between the same parties is upon a different claim or demand, the judgment in the prior action operates as an estoppel only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered. In all cases, therefore, where it is sought to apply the estoppel of a judgment rendered upon one cause of action to matters arising in a suit upon a different cause of action, the inquiry must always be as to the point or question actually litigated and determined in the original action; not what might have been thus litigated and determined. Only upon such matters is the judgment conclusive in another action." The case at bar presents an instance of the latter kind, it being for a different cause of action.

Similarly, in Scheer v. Trust Co., et al., 330 Mo. 149, 49 S. W. (2d) 135, this court said: "A judgment is conclusive in a subsequent action between the same parties on the same cause of action of all matters which might have been litigated therein; but where the causes of action are different, even where the parties are the same, it is only conclusive of matters which were in fact litigated therein. And it is not conclusive of any fact not necessary to be proved in the former case. Dolph v. Maryland Casualty Co., 303 Mo. 534, 261 S. W. 330, 332; National Bank of Commerce v. Maryland Casualty Co., 307 Mo. 417, 270 S. W. 691, 696." [See, also, Dickey v. Heim, 48 Mo. App. 114, and Barkhoefer v. Barkhoefer (opinion by GOODE, J.), 93 Mo. App. 373, 67 S. W. 674.]

The Circuit Court of Appeals considered the case de novo but on the evidence before the district court, under the Federal practice in equity cases, as in this court. [Central Life Ins. Co. v. Imsland, 91 F. (2d) 365; Chickasaw Wood Products Co. v. Paysinger, 84 F. (2d) 476; Holding Co. v. Snyder, 79 F. (2d) 263, 103 A. L. R. 912 (C. C. A. Mo.); Aro. Equipment Corp. v. Herring-Wisler Co., 84 F. (2d) 619; Hoffman v. Hogan, 345 Mo. 903, 137 S. W. (2d) 441; Taylor v. Hamrick (Mo.), 134 S. W. (2d) 52.] Having tried the case de novo on appeal, and having reached the conclusion that for certain reasons (the invalidity of the Jones franchise not being one of them), the utility was not entitled to an injunction, the court proceeded to say, "We think that the decree was right for the reasons stated, and it is therefore affirmed." This did not amount to a general affirmance, nor an affirmance on the opinion below, but was necessarily a special affirmance, i. e., "for the reasons stated," and, as we have held, it did not determine the validity of the Jones franchise, and consequently that question has not become res judicata.

The next question to be determined is whether electric light provisions of the Jones franchise are invalid because, as relator asserts, the town council was without power to grant an electric franchise when the ordinance in question was passed. It is expressly admitted that under the authority of State ex rel. City of Springfield v. Springfield Water Co., 345 Mo. 6, 131 S. W. (2d) 525, the Jones franchise, insofar as it authorized the operation of a gas plant was valid at the time of its grant. It will be recalled that at that time (1886) the town was operating under a special charter. As will be seen, no specific authority to grant an electric franchise is contained in said charter.[2] Nor did Secs. 951 and 952, [878] R. S. '79, in relation to powers of municipalities to contract for gas and water service (applicable to all municipalities whether organized under special charter or under the general statutes) authorize an electric franchise. It was not until 1889, three years after the Jones franchise was grant-

---

[2]The special charter authorized the town council, by ordinance:

"Fifth. (Article III) To establish, open, abolish, alter widen, extend, graduate, pave or otherwise improve all streets, avenues, alleys, sidewalks, public grounds and squares, and to provide for the lighting, cleaning and repairing of same.

"Tenth. (Article III) To prevent and extinguish fires; . . . may regulate . . . the establishment of any manufactory or business that is calculated to cause fires or conflagrations.

"Eleventh. (Article III) . . . to prevent and remove all obstructions and encroachments on the sidewalks, streets, avenues, alleys and all other public property . . .

"Thirteenth. (Article III) Finally, to pass all such ordinances as may be expedient in maintaining the peace, good government, health and welfare of the town.

and, "Sec. 6. (Article VII) The council shall have power, by ordinance, to direct and regulate the working and improving of all streets, avenues, alleys, sewers and drains in said town, and provide for the lighting and cleaning of the streets, avenues and alleys."

ed, that Secs. 951 and 952 were amended so as to include electric franchises. No direct power being found in the statutes and charter it must be denied unless the power is necessarily implied. Under the charter provisions we have set out there was a delegation of general power to the city to regulate the public use of the streets and to provide for the lighting of the same, and to enact ordinances for the welfare of the town. Neither the charter nor the statutes contained any limitation on the power of the town to grant an electric franchise. In this situation the Commissioner held that the passage of the Jones franchise was within the necessarily implied powers of the town, and this, we think, is abundantly supported by the authorities.

In State ex rel. St. Louis Underground Service Co. v. Murphy, 134 Mo. 548, 31 S. W. 784, this court en banc said:

"To it (the city of St. Louis) is also delegated general police powers and under them it is authorized to pass 'all such ordinances as may be expedient in maintaining the peace, good government, health, and welfare of the city, its trade, commerce and manufactures.' In the exercise of the powers thus delegated it has the undoubted right to regulate the public use of the streets both above and beneath the surface. This it constantly does by allowing public sewers, water mains and gas pipes to be laid beneath the surface, and regulating the manner in which the work shall be done. . . . It has also been held that the general power to regulate the use of streets is not confined to public uses common and known at the time of the dedication, but extends to new uses as they spring into existence. St. Louis v. Bell Telephone Co., 96 Mo. 629. . . . Under the power thus delegated it can not now be questioned that the municipal authorities can permit the use of the surface of the streets for the erection of telegraph and telephone poles, and the laying of railroad tracks; the space above the surface for stringing electric wires for the transmission of messages and the creation of light, and may also permit the laying of water and gas pipes, and sewers, beneath the surface."

See, also, State ex rel. City of Springfield v. Springfield City Water Co., supra; Western Union Telegraph Co. v. Guernsey, et al., 46 Mo. App. 120; City of Lexington ex rel. v. Lafayette Co. Bank, 165 Mo. 671, 65 S. W. 943; St. Louis v. Western Union Telegraph Co., 149 U. S. 465; Pike's Peak Power Co. v. City of Colorado Springs, 101 Fed. 1 (citing our own Springfield Water Co. case); Owensboro v. Cumberland T. & T. Co., 230 U. S. 58; Old Colony Trust Co. v. City of Omaha, 230 U. S. 100.

Relator relies on City of Carthage v. Carthage Light Co., 97 Mo. App. 20, 70 S. W. 936, decided December 1, 1902, by the Kansas City Court of Appeals. The charter provisions there considered (authorizing the city to grant the right to erect water or gas works, lay pipes, etc.) were held not to authorize an electric franchise, the court saying, "We may take notice of the fact that in 1875, when the said

act was passed, among the possibilities of electricity, that of using it as an illuminator to the extent of lighting a city by means of it was not one of those contemplated by the legislature. There are no terms employed in the act which authorized the passage of an ordinance to erect an electric plant, or to occupy the streets and alleys with the poles and wires used by it· for the transmission of power, etc. The grant of legislative [879] powers to municipalities is to be strictly construed, and if there be a reasonable doubt of the existence of a power it will be held not to have been granted. Knapp v. Kansas City, 48 Mo. App. 485; Kansas City v. Lorber, 64 Mo. App. 608; Waterworks v. Kansas City, 20 Mo. App. 237; City of St. Louis v. Telephone Co., 96 Mo. 626, 10 S. W. 197, 2 L. R. A. 278, 9 Am. St. Rep. 370. It can be safely asserted as a fact that the lighting of the plaintiff city by electricity was not one of the things the legislature had in mind, or intended to authorize or accomplish, by the passage of the act.'' This holding is contrary to, and in conflict with the Murphy case, supra, which had been decided by this court about seven years earlier. The Murphy case was not mentioned in the Carthage case, and it is apparent it was overlooked. It cannot be claimed that its effect was to overrule the Murphy case, which is authoritative. It is not urged that popular approval of the Jones franchise was required at the time it was granted, nor could such contention be made in view of our holdings in State ex inf. Chaney v. West Missouri Power Co., 313 Mo. 283, 281 S. W. 709, and in the Springfield Water Co. case, supra. The enactment of the ordinance granting the Jones franchise having been within the implied powers of the town under its charter, the contention of relator to the contrary must be disallowed. There being ''no limitation in the general law of the state, nor charter of the city, as to duration of franchises for public utilities in·the streets, the grant of an easement for that purpose, not specifying a period of duration, is in perpetuity.'' [State ex inf. Chaney v. West Missouri Power Co., supra. See, also, Springfield Water Co., supra.]

Thus far we are in accord with out Special Commissioner, but his report recommends ouster, which recommendation is based upon certain conclusions which we deem to be erroneous. He found that the Bailey franchise was repealed by an ordinance enacted in 1900 when it still had ten years to run. This is erroneous. The repeal effected in 1900 was that of an ordinance relating to street lighting, and not the Bailey franchise itself. We say this because the 1900 ordinance was a new contract for street lighting, the repealing provisions of which read as follows: ''Sec. 7: That an ordinance specifying the terms and conditions of a contract with the Trenton Thompson Houston Electric Light Company to furnish lights for the City of Trenton be and the same is hereby repealed.'' The latter ordinance was introduced in evidence. It was enacted in 1896, bears the identical title described last above, and relates exclusively to the *street*

*lighting* contract. It is true that after the expiration of the Bailey franchise no attempt was made to secure a renewal thereof, and respondent and its predecessors operated the gas and electric light plants continuously thereafter and are. now operating same. After the expiration of the Bailey franchise, and on March 22, 1911, a new street lighting contract was made with the company then operating the consolidated properties. It was therein recited, "Nothing in this ordinance contained shall be so construed as to release the company from the obligations imposed upon it by franchises or amendments thereto granted to C. D. Jones and his associates known as the Trenton Gas & Electric Company whose successor it is, except as may be specifically provided for in the terms and conditions hereof." Again on May 6, 1914, the identical provision was contained in a new street lighting contract. The Bailey franchise was not referred to in either of said ordinances. These recitals can mean nothing else than that the company was operating under the Jones franchise.

The Special Commissioner found that the electric rights in the Jones franchise were automatically forfeited 'under Section 7 thereof because from 1886 to 1897 the holder failed to exercise the power granted to construct an electric light plant "and stood idly by and permitted the Trenton-Thompson-Houston Company to receive its franchise, make its investment, construct its plant, occupy the streets and serve the people of the town with electricity for a period of seven years before purchasing the same."

Section 7 of the Jones franchise appears in the footnotes on pages 6 and 7 hereof, to which the reader is referred. The Commissioner argues that the words "abandon the enterprise or cease to operate the works," as used in said section, refer to a combined gas and electric plant, emphasizing that the word "works" is used in the plural. This is untenable for several reasons. Upon a reading of the entire ordinance (set forth in the footnotes), it will be noted that in many of its parts [880] the word "works" is used as applying to either an electric light plant, a gas plant or both. In Section 1 the holder is given the privilege of "erecting a gas and electric light works or either of them." Under Section 4 authority was granted to construct and maintain "gas and electric light works or either of them," and "to carry on the business of manufacturing gas and electricity or either of them and distributing the same." Section 6 provides "this ordinance *is conditioned* on the building or causing to be built by said Trenton Gas & Electric Light Co. gas *or* electric light works . . . which said gas *or* electric light works shall be commenced on or before August 1, 1886, and completed on or before December 1, 1886," and was also conditioned on supplying gas of a certain quality and price. There were many other provisions which show that the primary purpose was to provide gas for the city, and that electricity was only incidental. The use of electricity was then

in its infancy, whereas gas had been widely used for a great many years. Considering Section 7 by itself, it would seem clear that the forfeiture clause can have no application to the failure to distribute electricity if the holder of the franchise shall have complied with all the requirements thereof as to manufacture and distribution of gas. And when the provisions of the other sections dealing with gas *or* electric light works are considered, this construction is further emphasized. Section 7 provides "but so long as said company shall well and truly keep and perform the conditions of this ordinance, the rights and privileges granted herein shall not be revoked for any other causes . . . ." The condition, insofar as regards a plant, was not to build a plant for *both* electricity *and* gas, but for electricity *or* gas. We hold that any automatic forfeiture provisions of Section 7 have no application in view of the admitted construction and operation of the gas plant.

The Commissioner's report cites the case of State ex inf. Chaney v. West Missouri Power Company, supra, the holding of which we have noticed above, and applied to the Jones franchise. That decision makes the following qualification, "The franchise held by appellant, though in perpetuity, is subject to forfeiture for misuser, nonuser or abandonment." Since there was no issue of nonuser or abandonment in that case, it is mere dictum. However, it is a sound statement of the law, but not applicable under the facts of this case. This for the reason the city would have no right to declare forfeiture after having received continuous electrical service from successive holders of the Jones franchise since 1897, merely because when the electrical industry was in its infancy, the holder of the franchise elected to first build a gas plant and did not commence to furnish electrical service until it had acquired in 1897 an electrical plant which had been built by others.

The case chiefly relied on by the Commissioner is that of State ex inf. v. Light and Development Company, 246 Mo. 618, 152 S. W. 67. There an ordinance of the City of St. Louis authorized a non-exclusive franchise to any party who took certain steps accepting the terms of an ordinance. The Aloe Company took such steps, and for a few years provided limited service. It then abandoned the enterprise, selling its contracts and equipment, and for 22 years it rendered no service whatever under its franchise, and did not carry the franchise on its books as an asset. After this had been the situation for 22 years a new corporation was formed. It took an assignment of the Aloe Company's franchise, and filed certain applications for permits with the city authorities. This court held, in a quo warranto proceeding, that the city was entitled to forfeit the franchise, saying: "It must be held both on authority and reason that where the grant of a franchise is upon the implied condition that it shall be used for the public benefit, and there is a continued breach of the condition, either

because of misuser or nonuser, a *cause* for forfeiture exists.'' [l. c., Mo. 642, S. W. 72.] When it was urged that the right to forfeiture was lost when not asserted until after attempts to resume the use, the court stated, ''Here the cause for forfeiture has not ceased; the nonuser has continued. This franchise *was* and *is* in *complete* disuse. It had been, to all intents and purposes, abandoned. The fair inference was that all claims thereunder had been surrendered to the State. *There was, therefore, no occasion for the State to assert its right to forfeit* this dead and apparently forgotten franchise *until some attempt should be made to galvanize it into life.*'' (Italics, the present writer's.) The above authorities do not announce an automatic forfeiture for nonuser or abandonment, but merely the *right* to forfeiture when sought to be exercised under circumstances that would make the exercise of [881] that right equitable. They are in full accord with the holding in Kavanaugh v. St. Louis, 220 Mo. 496, 119 S. W. 552, that forfeiture is not automatic even where it is a clear case of abandonment.

It is a well-settled rule that forfeitures are not favored. In Robinson v. Cannon, 346 Mo. 1126, 145 S. W. (2d) 146, a deed provided that if certain restrictive covenants against the sale of intoxicating liquors on the premises were violated, ''then this deed shall be null and void, and all right, title and interest of, in and to the premises hereby conveyed shall revert to the said party of the first part, his heirs and assigns.'' The language is quite strong, but this court, following the policy that forfeitures are not favored, refused to declare a forfeiture after a delay of many years, although the prohibited use of the property was still continuing. The same policy is applied where it is sought to forfeit a franchise. [26 C. J. 1044.]

The holders of the Jones franchise prior to the consolidation in 1897 were actively carrying out what was obviously the primary purpose of said franchise, the furnishing of gas. This court has recognized the fundamental distinction between partial exercise of franchise privileges and total nonuse or abandonment of all activity under a franchise. In State ex rel. McAllister v. Cupples Station L. H. & P. Co., 283 Mo. 115, 223 S. W. 75, a corporation acquired in 1896 a limited, nonexclusive electric light and power franchise under a city ordinance. Seventeen years later it extended its poles and wires to several new areas that it had not theretofore served. Four years thereafter a quo warranto proceeding was filed. In denying ouster, the court en banc said, ''We do not think it a necessary conclusion that, because a franchise holder did not operate in all districts in which it was authorized to operate, it thereby lost all authority to operate in such unoccupied districts.'' [l. c. Mo. 159, S. W. 88.] And the fact that the franchise is not exclusive, as here, justifies a more lenient attitude by the court when a forfeiture is sought for nonuser. [State ex inf. v. Light & Development Co., supra.] But the city has never under-

taken to declare a forfeiture of the Jones franchise for nonuser, and such is not the purpose of, nor the ground for, this proceeding, as will appear from the charges in the information hereinabove set out.

The foregoing matters are, we think, decisive of the case, so it becomes unnecessary to discuss the other points briefed, including those relating to estoppel and laches. The writ of ouster should be denied. It is so ordered. *Tipton, Clark, Douglas, JJ.*, and *Ellison, C. J.*, concur; *Hyde, J.*, not sitting; and *Gantt, J.*, absent.